**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MERAIAH G. BELCHER,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TENNESSEE DEPARTMENT OF HEALTH; ADALBERTO VALDEZ, in his individual and official capacities; DORALYN LIDDELL, in her individual and official capacities; and DARLENE BROWN, in her individual and official capacities;**<br><br>**Defendants.** | ) | **Case No. __________**<br><br>**JURY DEMAND** |

**COMPLAINT**

Plaintiff Meraiah G. Belcher, by and through counsel, for her Complaint against Defendants, states as follows:

**I. NATURE OF THE ACTION**

1. This is an action for race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; for intentional race discrimination and retaliation in violation of 42 U.S.C. § 1981, enforced against the individual Defendants through 42 U.S.C. § 1983; for denial of the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution, enforced through 42 U.S.C. § 1983; and for related claims under Tennessee law.

2. Plaintiff asserts her Title VII claims against Defendant Tennessee Department of Health ("TDH") only. Plaintiff does not assert Title VII claims against any individual Defendant,

because an individual supervisor or manager who does not independently qualify as an "employer" is not subject to personal liability under Title VII.

3. Plaintiff asserts her claims against Defendants Valdez, Liddell, and Brown under 42 U.S.C. § 1983 in their individual capacities for compensatory and punitive damages, and in their official capacities solely for prospective injunctive and equitable relief.

4. Plaintiff, an African American, has worked as a Registered Nurse 2 ("RN2") at the Wilson County Health Department ("WCHD"), a Tennessee Department of Health ("TDH") - operated local health department, for more than eleven years. She complained about the conduct of her supervisor, Defendant Darlene Brown, in November 2024. Thereafter, TDH subjected Plaintiff to an HR investigation without identifying the factual allegations against her; required her to surrender her personal phone and Apple Watch during that interview; denied her promotion to an RN4 position based on stated lack of supervisory experience; assigned her as permanent primary nurse for the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC") despite her lack of prior WIC experience; selectively scrutinized her WIC performance; and included disputed allegations in her annual review.

5. TDH publicly characterized Plaintiff's reassignment as a routine RN2 duty assignment based on grounds that later comments by management rendered pretextual. White nurses with prior WIC experience were not assigned as permanent primary WIC nurse; Plaintiff was assigned permanent primary WIC duties without the formal onboarding and adjustment framework later given to a white nurse; and Plaintiff alone was subjected to a prepared productivity review and negative evaluation content tied to the assignment despite contemporaneous records reflecting strong clinical performance and later management praise of Plaintiff and the WIC team.

## II. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331.

7. This Court has subject matter jurisdiction over Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983 pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4).

8. No administrative exhaustion or notice requirement applies to Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983.

9. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts as her federal claims.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in the Middle District of Tennessee, including Wilson County, Tennessee.

11. Plaintiff timely filed EEOC Charge No. 494-2025-01488. The EEOC issued a Determination and Notice of Rights on May 20, 2026. Plaintiff files this action within the applicable 90-day period.

12. Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983 arise under the Civil Rights Act of 1991, which for the first time extended 42 U.S.C. § 1981 to all benefits, privileges, terms, and conditions of the contractual relationship, see 42 U.S.C. § 1981(b), and which supplies the basis for Plaintiff's claims of discriminatory terms and conditions of employment, discriminatory work assignment, and retaliation. Those claims are therefore governed by the four-year limitations period of 28 U.S.C. § 1658, and each was filed well within four years of the conduct alleged.

13. In the alternative, and to the extent any shorter limitations period is held to apply, Plaintiff's claims are timely because Defendants have continued, within the limitations period and

through the filing of this Complaint, to presently impose upon Plaintiff a disparate work assignment. Plaintiff remained assigned as the permanent primary WIC nurse, remained subject to the materially different terms, conditions, and privileges of employment that accompany that assignment, and continued to be denied the general-clinic presence, "left in charge" opportunities, and supervisory-development and promotional opportunities that the assignment foreclosed within the past year. That assignment is not merely a lingering consequence of a completed act; it is an operative work assignment that Defendants impose, administer, and re-impose upon Plaintiff each week, and Defendants have declined to alter it.

14. Plaintiff further alleges that Defendants concealed material facts bearing on the discriminatory and retaliatory character of their conduct, and that Plaintiff did not know and could not reasonably have known those facts when the conduct occurred. Among other things, TDH declined to identify the accusation or the accuser during the January 16, 2025 investigation; Defendants did not disclose that the WIC assignment had been directed from outside WCHD until Defendant Valdez's March 6, 2025 statement; and Defendants did not disclose that the disputed evaluation content had been supplied by regional management until the July 24, 2025 meeting. To the extent any limitations period is held to have begun to run before Plaintiff learned these facts, that period was tolled, and Defendants are estopped from relying upon it.

15. Plaintiff pleads the events preceding the limitations period as background evidence supporting her timely claims and as proof of Defendants' intent, and does not concede that any act alleged in this Complaint is untimely as to any claim.

16. Plaintiff's claims against Defendants Valdez, Liddell, and Brown in their official capacities seek prospective relief from an ongoing violation of federal law, including Plaintiff's continuing assignment and the continuing denial of supervisory-development and promotional opportunity.

## III. PARTIES

17. Plaintiff Meraiah G. Belcher is an adult resident of Rutherford County, Tennessee. At all relevant times, she worked as an RN2 at WCHD in Lebanon, Tennessee.

18. Defendant TDH is Plaintiff's employer within the meaning of Title VII. TDH is an agency of the State of Tennessee subject to suit under Title VII

19. Defendant Adalberto Valdez is the County Director of WCHD.

20. Defendant Doralyn Liddell is TDH's Regional Nursing Director.

21. Defendant Darlene Brown is Plaintiff's Nursing Supervisor, RN4.

22. At all relevant times, Defendants Valdez, Liddell, and Brown were officials and employees of the State of Tennessee who acted under color of state law and within the apparent authority of their respective offices.

23. Each of Defendants Valdez, Liddell, and Brown personally participated in, directed, approved, or ratified the conduct alleged against him or her in this Complaint. Plaintiff does not seek to hold any individual Defendant liable on a theory of respondeat superior.

24. To protect the privacy of non-party employees, this Complaint refers to non-party employees by neutral designations, such as "Nurse A." Plaintiff will provide Defendants with a key identifying each designation and will file such a key under seal if the Court so directs.

## IV. JURY DEMAND

25. Plaintiff demands a trial by jury on all issues so triable.

## V. FACTUAL ALLEGATIONS

### A. Plaintiff's work history and qualifications

26. Plaintiff holds a Bachelor of Science in Nursing, a Bachelor of Science in Health Education, a Tennessee Registered Nurse license, a teaching license, and a Certified in Public Health ("CPH") credential.

27. Plaintiff has worked for TDH since approximately September 2014 and, at the time of filing, has more than eleven years of continuous TDH service.

28. Plaintiff was, at all relevant times, the only African American nurse at WCHD.

29. Plaintiff had a documented history of satisfactory and strong performance. Defendant Brown's April 22, 2025 interim evaluation stated that Plaintiff was proficient in clinical services, had accurate and complete documentation, maintained excellent relationships with patients, worked well with the general-clinic team, and was learning and training with the WIC team.

**B. April–July 2025: Further Complaints, WIC Scrutiny, and Evaluation**

30. Plaintiff continually raised concerns with how she was treated as the sole African American Nurse at WCHD to Defendant Brown, her direct supervisor, and Defendant Valdez, the Director.

31. In November 2024, Defendant Brown bumped into Plaintiff.

32. Plaintiff was offended that Brown did not offer any sort of apology for doing so.

33. Plaintiff calmly and politely attempted to explain to Defendant Brown that she felt disrespected by Brown's lack of acknowledgement or apology.

34. Brown responded by screaming at Plaintiff.

35. Another nurse with whom Plaintiff worked closely ("Nurse A") was nearby during the events and approached after hearing Defendant Brown's raised voice.

36. Nurse A's observation led to her subsequent discipline for eavesdropping.

37. On November 8, 2024, Plaintiff sent a formal email to Defendants Valdez and Brown requesting a meeting with Defendant Valdez to resolve ongoing workplace issues and mistreatment involving Defendant Brown.

38. Defendant Valdez accepted the request and scheduled a formal meeting for November 21, 2024. Plaintiff sought this meeting to explicitly address her concerns regarding racial disparate treatment and hostility as the sole African American nurse at WCHD.

39. However, Defendant Brown subsequently notified Plaintiff that the meeting was postponed. Plaintiff did not request or cause this postponement, and Defendants effectively thwarted Plaintiff's immediate opportunity to verbally articulate the racial nature of her grievances within the local chain of command before initiating adverse actions against her.

40. Although Defendants prevented this meeting, management was fully aware that Plaintiff's concerns were grounded in race discrimination. Indeed, on March 6, 2025, Defendant Valdez explicitly confirmed management's understanding of her ongoing opposition when he confronted Plaintiff and asked why she raised race so often.

41. On November 22, 2024, Defendant Valdez sent Nurse A a written "Specific Action Plan," copied to Defendant Brown and another member of the WCHD management team ("Manager B"). The document accused Nurse A of eavesdropping on private conversations involving Brown, Plaintiff, and management.

42. The plan directed Nurse A not to eavesdrop on conversations or private matters and stated that failure to comply could result in discipline and jeopardize Nurse A's state education benefits.

43. On information and belief, and based on the timing, subject matter, and threatened loss of state education benefits, Valdez's warning was intended to intimidate Nurse A and discourage her from communicating information supportive of Plaintiff's November 2024

complaint or otherwise assisting Plaintiff in pursuing that complaint. Plaintiff expects discovery to provide additional evidentiary support for this allegation.

**C. Retaliatory HR investigation**

44. On January 16, 2025, Plaintiff was unexpectedly approached by Defendant Valdez and directed to participate in an HR investigation interview.

45. On the way to a conference room for the interview, Plaintiff passed Nurse A who appeared visibly upset.

46. Plaintiff asked Nurse A if she was alright, but Defendant Valdez instructed the women not to speak to each other.

47. Outside of the conference room, Valdez directed Plaintiff to place her personal phone and Apple Watch in a prepared ziplock bag. Valdez then took the bag to his office.

48. Plaintiff was placed alone in a closed conference room for a remote interview with TDH officials via the Teams program on a laptop.

49. Plaintiff learned in this interview that TDH was investigating Plaintiff for allegations that Plaintiff had discriminated against someone and created a hostile work environment.

50. Plaintiff was not told the specific conduct alleged, the factual basis for the allegation, or the identity of the complainant.

51. TDH representatives repeatedly questioned Plaintiff about whether she was acting in a supervisory capacity and whether any employee reported to her. Plaintiff understood the questioning to concern whether Nurse A had acted at Plaintiff's direction. Plaintiff denied holding a formal supervisory role.

52. Plaintiff later learned that Nurse A was subjected to the same device-surrender procedure and interview.

53. Plaintiff is unaware of any employee having their devices confiscated as part of a Human Resources investigation except in this situation after Plaintiff had requested a meeting to discuss her concerns about her disparate treatment as the only black nurse in WCHD.

54. On information and belief, non-African American employees and employees who had not engaged in protected activity were not subjected to device confiscation or search procedures during internal HR inquiries or workplace investigations.

55. After her interview, Plaintiff asked Defendant Valdez when her November 2024 complaint was going to be investigated, and Defendant Valdez accused Plaintiff of cancelling the November 21, 2024 meeting.

56. The surprise device-surrender procedure, the lack of identified allegations, and the isolation of Plaintiff for the remote interview contributed to the intimidating manner in which TDH handled the investigation.

57. Following the investigation, coworkers made jokes in Plaintiff's presence about workplace-harassment and abuse investigations that Plaintiff reasonably understood to be directed at her. Valdez and Manager B laughed at the comments.

58. Plaintiff complained to Defendant Valdez that this was inappropriate, but he essentially brushed off her concerns.

59. On February 3, 2025, HR issued a letter clearing Plaintiff of any wrongdoing.

**D. RN4 Promotion Denial and WIC Assignment**

60. Plaintiff applied for an RN4 position in February 2025.

61. Plaintiff was certified eligible for the position and interviewed on February 20, 2025.

62. On February 26, 2025, Defendant Liddell announced that Plaintiff and another white nurse ("Nurse C") would be attending WIC training.

63. Later that same day, Defendant Liddell left Plaintiff a voicemail.

64. Plaintiff attempted to return Defendant Liddell's calls a number of times.

65. Finally, on March 3, 2025, Defendant Liddell informed Plaintiff over the phone that she had not been selected for the RN4 promotion.

66. Defendant Liddell informed Plaintiff that she had not been selected because she lacked supervisory experience.

67. TDH's RN4 posting did not list supervisory experience as a minimum qualification or necessary special qualification

68. The written non-selection notice Plaintiff received provided no reason for the decision.

69. TDH selected a white nurse ("Nurse D") who did not hold Plaintiff's CPH credential or advanced degrees.

70. Plaintiff asked Defendant Brown how she could develop supervisory experience. Defendant Brown told Plaintiff that she could apply for RN3 positions as they became available and indicated that Plaintiff could potentially be "left in charge" at WCHD during general clinical shifts.

71. However, Plaintiff's assignment to primary WIC duties substantially reduced her presence in the general-clinic setting where she could have received the "left in charge" experience Defendant Brown identified, and no such opportunity materialized.

72. TDH used an unwritten and post hoc criterion to deny Plaintiff's promotion, and Defendant Liddell, the same decision-maker, assigned Plaintiff to primary WIC duties at approximately the same time she denied Plaintiff's promotion. This reassignment materially reduced Plaintiff's access to general-clinic supervisory-development opportunities and perpetuated the asserted deficiency that allegedly cost her the promotion.

73. This is further enhanced by the focus on presenting Plaintiff as a supervisor in the January 2025 investigation: TDH explored whether Plaintiff had exercised supervisory authority

when investigating her, yet later relied on the absence of formal supervisory experience to deny her promotion.

74. Three of Plaintiff's white colleagues had previous experience as WIC nurses.

75. When Plaintiff asked for an explanation as to why she had been assigned to WIC, TDH officials claimed Plaintiff was selected because she had fewer duties than other nurses.

76. On information and belief, this explanation was false and pretextual.

77. On information and belief, three white nurses with prior WIC experience were bypassed, while Plaintiff, the only African American nurse and one with no prior WIC experience, was made the permanent primary WIC nurse.

78. Plaintiff received WIC training in March 2025 but was not given the formal written adjustment period, temporary designation, and onboarding framework that TDH later provided to a white nurse who picked up additional WIC responsibility shortly after Plaintiff.

79. On March 6, 2025, during a meeting concerning Plaintiff's WIC assignment, Defendant Valdez stated that the decision to place Plaintiff in WIC had been directed from outside WCHD.

80. When Plaintiff explained that she was the only African American nurse at WCHD, that there had never been an African American WIC nurse, and that white nurses with prior WIC experience had not been selected, Valdez responded that Plaintiff would "bring in that population also to WIC."

81. Defendant Valdez adopted a race-based rationale for Plaintiff's assignment, treating Plaintiff's race as a reason she was suited to the WIC assignment, while simultaneously questioning why Plaintiff raised race at all. TDH has never asserted this rationale as a basis for the assignment in any written explanation, in the EEOC process, or otherwise.

82. During the same meeting, another nurse present confirmed that Plaintiff was the only African American nurse who had worked at WCHD, and Plaintiff identified three white nurses who had prior WIC experience but were not assigned to the primary WIC position.

83. Also during the March 6, 2025 meeting, Defendant Valdez accused Plaintiff of coming into the WIC assignment with a negative attitude.

84. Plaintiff denied the accusation and asked Defendant Valdez to retract it, and he stated that he would. Approximately four months later, Plaintiff's annual evaluation still asserted that Plaintiff had displayed negativity in connection with WIC.

85. Defendant Valdez also stated in this meeting that the nurses assigned to WIC would be removed from medical-clinic duties so as to be "fully focused on WIC," which is inconsistent with TDH's stated rationale that Plaintiff was selected for the WIC assignment because she had fewer duties than other nurses.

86. These statements contradict TDH's stated workload-based explanation for selecting Plaintiff and support Plaintiff's allegations of race discrimination, retaliatory animus, and pretext.

87. They also demonstrate that Defendant Valdez was entirely aware that Plaintiff believed she was being treated discriminatorily and hostilely due to her race.

88. Plaintiff was required to carry primary WIC duties approximately three days per week, maintaining general clinic duties on Mondays and Fridays.

89. Nurse C, a white nurse with prior WIC experience, was selected as the secondary WIC nurse in spring 2025.

90. Plaintiff was assigned to WIC three days per week beginning in spring 2025. TDH's records indicate that Nurse C performed materially fewer WIC days over the relevant period, though the precise totals will be confirmed through TDH scheduling and encounter records.

91. In November 2025, TDH's WIC meeting notes stated that Nurse C would begin working with WIC three days per week "like Meraiah does," corroborating that Plaintiff had been carrying the three-day WIC schedule.

92. Plaintiff's WIC reassignment caused career stagnation and loss of supervisory growth opportunities necessary for promotion.

**E. Protected Activity, Scrutiny, and Evaluation**

93. In April 2025, TDH conducted mandatory STAY interviews, an employee-feedback and retention process. Plaintiff raised concerns about her WIC assignment and workplace treatment during that process. To the extent her statements opposed discrimination and retaliation, they constituted protected activity.

94. Plaintiff participated in the mandatory STAY interview with the Mid-Cumberland Regional Assistant Director ("Regional Official 1") and a regional WIC official ("Regional Official 2"). During that interview, Plaintiff described her WIC reassignment, the RN4 selection process, the prior HR investigation, her resulting loss of trust in administration, and her concerns about favoritism and unequal treatment in the workplace.

95. Plaintiff conveyed that she believed she had been treated unfairly after raising concerns about Brown and that she feared she could be subjected to further unfounded accusations.

96. Separately, Plaintiff met with Defendant Brown and expressed concerns and discomfort regarding her WIC placement and transition.

97. On May 27, 2025, Plaintiff emailed a WIC program representative ("WIC Representative 1") concerning uncomfortable experiences associated with WIC training and work and referencing concerns she had previously discussed with Defendant Brown.

98. On June 3, 2025, TDH subjected Plaintiff to a prepared productivity review based on WIC encounter data and calendar materials.

99. TDH did not prepare an equivalent review for Nurse C, who had gone through WIC training during the same period.

100. On June 20, 2025, Valdez circulated a department-wide email acknowledging the results of the STAY interviews and stating that WCHD would address themes involving leadership, culture, communication, and morale. In the same message, Valdez praised Plaintiff and the WIC team by name.

101. On information and belief, this contemporaneous praise undermines TDH's later assertion that WIC performance and attitude justified her adverse evaluation treatment.

102. In July 2025, Defendant Brown issued Plaintiff's annual Individual Performance Plan ("IPP") evaluation for the August 2024–July 2025 cycle. The evaluation initially gave Plaintiff an overall rating of "Meets Expectations."

103. The initial annual IPP evaluation included statements that, during March WIC training, Plaintiff had made a comment to an instructor along the lines of "I will learn this material and be able to teach it better than you," had displayed negativity during class, and had questioned why training was needed.

104. The initial evaluation also stated that Plaintiff's WIC performance had not been where local and regional leadership wanted during a period, but that Plaintiff had since improved her WIC numbers and mindset.

105. Plaintiff promptly disputed these statements and explained that they were based on an out-of-context account of her response to direct questions posed during WIC training.

106. During a July 24, 2025 meeting, Defendant Valdez admitted that WCHD management had been instructed to include the training comments because regional management had characterized the comments as negative.

107. During the same July 24 meeting, Defendants Valdez and Brown acknowledged that Plaintiff's medical-clinic work was good and that the WIC-related concerns, together with an asserted lack of documented "above and beyond" activity, drove the "Meets Expectations" rating.

108. On July 28, 2025, Defendant Liddell agreed to remove the disputed WIC-training paragraph from Plaintiff's evaluation.

109. Following that correction, Plaintiff became eligible for an "Exceeds Expectations" rating and for the increased annual raise associated with that rating, rather than the lesser raise associated with the "Meets Expectations" rating initially assigned.

110. On information and belief, TDH's initial inclusion of the disputed, regionally supplied allegations—and the need for Plaintiff to challenge the evaluation to obtain correction—remain evidence of retaliatory and pretextual treatment.

111. On information and belief, the selective scrutiny, disputed evaluation content, and adverse ratings were retaliatory and impaired, or had the natural tendency to impair, her professional reputation and advancement prospects.

**F. Race-Related Workplace Content**

112. Plaintiff reported that a nurse practitioner referred to a Black patient as "mammie."

113. TDH acknowledged during the EEOC process that the incident occurred and reported that it imposed discipline.

114. Plaintiff also reported that, as she walked by, she heard a nurse say, "Aunt Jemima."

115. TDH allegedly investigated this report and later characterized the evidence as inconclusive.

116. Plaintiff was subjected to yelling and verbal abuse from colleagues and supervisors that she never witnessed her white peers experience.

117. Plaintiff observed the limited Black staff at WCHD being treated differently than her white peers. For example, another African American WCHD employee ("Employee E") resigned after being treated hostilely.

118. Defendant Valdez's prior March 6, 2025 race-based comments were part of a broader, ongoing environment of racial hostility and differential scrutiny by management.

119. Defendant Valdez questioning why Plaintiff brings up race rather than taking her concerns about a racially-charged environment seriously exacerbated the severe and pervasive nature of the work environment.

## VI. CAUSES OF ACTION

### COUNT I
### TITLE VII RACE DISCRIMINATION
### (Against TDH)

120. Plaintiff incorporates by reference the preceding paragraphs.

121. Plaintiff is African American, a member of a protected class.

122. Plaintiff has fully satisfied all statutory conditions precedent and exhausted her administrative remedies under Title VII prior to filing this action.

123. Plaintiff was qualified for her RN2 position and for the RN4 position for which she applied.

124. TDH subjected Plaintiff to adverse employment actions, including involuntary reassignment to permanent primary WIC duties under materially different conditions, denial of promotion to RN4, negative and false evaluation treatment, and other materially adverse changes in terms, conditions, and privileges of employment.

125. Similarly situated white nurses were treated more favorably, including nurses with prior WIC experience who were not selected as permanent primary WIC nurse and Nurse C, who was not subjected to equivalent scrutiny, onboarding deficiencies, or evaluation consequences and who was provided a formal adjustment and onboarding framework that TDH did not provide Plaintiff.

126. TDH's stated reasons were pretextual, as shown by inconsistent explanations, contemporaneous records, comparative treatment, and Defendant Valdez's March 6, 2025 statement that the assignment had been directed from outside WCHD.

127. As a direct and proximate result, Plaintiff has suffered damages.

**COUNT II**
**TITLE VII RETALIATION**
**(Against TDH)**

128. Plaintiff incorporates by reference the preceding paragraphs.

129. Plaintiff engaged in protected activity by making good-faith complaints through TDH's chain of command that she reasonably believed opposed discrimination, harassment, retaliation, and/or unequal treatment, including her November 2024 email to Brown and Valdez and later complaints, communications, and documented conversations that conveyed such opposition. Plaintiff also filed an EEOC charge in September 2025. TDH knew of Plaintiff's protected activity.

130. After Plaintiff engaged in protected activity, TDH subjected Plaintiff to an investigation conducted through an undisclosed accusation and a surprise device-surrender procedure, permanent primary WIC assignment without comparable onboarding, RN4 non-selection, selective productivity scrutiny, and disputed evaluation content and ratings.

131. The temporal proximity, documentary inconsistencies, management admissions, and retraction of evaluation content support a causal connection between Plaintiff's protected activity and the materially adverse actions taken against her.

132. As a direct and proximate result, Plaintiff has suffered damages.

**COUNT III**
**TITLE VII HOSTILE WORK ENVIRONMENT**
**(Against TDH)**

133. Plaintiff incorporates by reference the preceding paragraphs.

134. Plaintiff was subjected to unwelcome race-related conduct, including the reported "mammie" incident, the reported "Aunt Jemima" comment, hostility when Plaintiff raised race-related concerns, and differential treatment by management.

135. TDH knew or should have known of Plaintiff's concerns because Plaintiff reported the incidents and concerns to HR and management.

136. Indeed, Defendant Valdez criticized Plaintiff for constantly bringing up race.

137. The alleged conduct, viewed in its totality and together with the employment actions described above, contributed to an abusive work environment. Plaintiff pleads this claim in the alternative to her race-discrimination and retaliation claims.

138. Plaintiff suffered damages as a direct and proximate result.

**COUNT IV**
**42 U.S.C. § 1981, ENFORCED THROUGH 42 U.S.C. § 1983**
**RACE DISCRIMINATION**
**(Against Defendants Valdez, Liddell, and Brown)**

139. Plaintiff incorporates by reference the preceding paragraphs.

140. Section 1981 guarantees to all persons within the jurisdiction of the United States the same right to make and enforce contracts, including the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, as is enjoyed by white citizens.

141. Plaintiff's employment relationship with TDH is a contractual relationship within the meaning of 42 U.S.C. § 1981.

142. Because Defendants Valdez, Liddell, and Brown are state actors, Plaintiff asserts her rights under 42 U.S.C. § 1981 against them through 42 U.S.C. § 1983, which provides the remedy for the deprivation of those rights by persons acting under color of state law.

143. Acting under color of state law, Defendants Valdez, Liddell, and Brown intentionally discriminated against Plaintiff because of her race by, among other things: (a) assigning her permanent primary WIC duties without the written adjustment period, temporary designation, and onboarding framework provided to a white nurse; (b) bypassing white nurses who had prior WIC experience; (c) denying her promotion to RN4 based on an unwritten, post hoc supervisory-experience criterion while selecting a white nurse who lacked Plaintiff's credentials; (d) simultaneously assigning her to duties that foreclosed the very supervisory experience cited as the basis for her non-selection; (e) subjecting her, and not comparable white nurses, to a prepared productivity review and to negative evaluation content that TDH later removed; and (f) imposing materially different terms, conditions, and privileges of employment and differential scrutiny.

144. Defendant Brown personally screamed at Plaintiff, participated in the events leading to the January 2025 investigation, authored the initial annual IPP evaluation containing the disputed WIC-training content notwithstanding her own contrary April 22, 2025 interim review, and identified supervisory-development opportunities that the WIC assignment then foreclosed.

145. Defendant Liddell personally denied Plaintiff's RN4 promotion based on a supervisory-experience criterion absent from the posting, announced and effected Plaintiff's WIC assignment at approximately the same time, and controlled the content of Plaintiff's annual evaluation, including the eventual removal of the disputed paragraph.

146. Defendant Valdez personally directed the device-surrender procedure and the isolation of Plaintiff during the January 16, 2025 interview, instructed Plaintiff and Nurse A not to speak to one another, issued the written warning threatening Nurse A's state education benefits,

stated on March 6, 2025 that the WIC assignment had been directed from outside WCHD, laughed at investigation-related jokes directed at Plaintiff, rebuked Plaintiff for raising race, and endorsed a race-based rationale for Plaintiff's WIC assignment in the same recorded meeting.

147. Plaintiff's race was a but-for cause of the challenged decisions, assignments, and treatment.

148. Defendants Valdez, Liddell, and Brown acted intentionally, knowingly, and with reckless or callous indifference to Plaintiff's federally protected rights.

149. As a direct and proximate result, Plaintiff has suffered lost promotional and compensation opportunities, lost supervisory-development and career-advancement opportunities, emotional distress, reputational injury, and other damages. Plaintiff is entitled to compensatory damages, punitive damages against Defendants Valdez, Liddell, and Brown in their individual capacities, prospective equitable relief, and attorney's fees and costs under 42 U.S.C. § 1988.

150. The conduct alleged in this Count continued into and within the applicable limitations period. Defendants have continued to impose the permanent primary WIC assignment upon Plaintiff and its materially different terms and conditions, and have continued to deny Plaintiff the supervisory-development and promotional opportunities that the assignment forecloses, through the filing of this Complaint.

**COUNT V**
**42 U.S.C. § 1981, ENFORCED THROUGH 42 U.S.C. § 1983**
**RETALIATION**
**(Against Defendants Valdez, Liddell, and Brown)**

151. Plaintiff incorporates by reference the preceding paragraphs.

152. Section 1981 prohibits retaliation against a person who complains of or opposes race discrimination in the making and enforcement of contracts, including in the terms and conditions of employment.

153. Plaintiff engaged in protected activity, including her November 8, 2024 email to Defendants Valdez and Brown; her statements during the April 2025 STAY interview; her complaints to Defendant Brown and to WIC Representative 1 regarding her WIC assignment and treatment; her reports of the "mammie" and "Aunt Jemima" incidents; her objection to Defendant Valdez concerning investigation-related jokes; her challenge to the disputed evaluation content; and her September 2025 EEOC charge.

154. Each of Defendants Valdez, Liddell, and Brown knew of Plaintiff's protected activity. Valdez and Brown received the November 8, 2024 email; Valdez received Plaintiff's objections directly; and Liddell participated in the promotion, assignment, and evaluation decisions that followed those complaints.

155. Acting under color of state law, Defendants Valdez, Liddell, and Brown retaliated against Plaintiff by subjecting her to an investigation premised on an undisclosed accusation and a surprise device-surrender procedure, by assigning her permanent primary WIC duties without comparable onboarding, by denying her the RN4 promotion, by subjecting her to selective productivity scrutiny, and by inserting and maintaining disputed content in her annual evaluation.

156. The temporal proximity of these actions to Plaintiff's protected activity, the shifting and unwritten justifications, the management admissions of July 24, 2025, and the subsequent retraction of the disputed evaluation content establish a causal connection between Plaintiff's protected activity and the adverse actions.

157. Defendants acted intentionally and with reckless or callous indifference to Plaintiff's federally protected rights. As a direct and proximate result, Plaintiff has suffered damages and is entitled to compensatory and punitive damages, prospective equitable relief, and attorney's fees and costs under 42 U.S.C. § 1988.

158. The conduct alleged in this Count continued into and within the applicable limitations period. Defendants have continued to impose the permanent primary WIC assignment upon Plaintiff and its materially different terms and conditions, and have continued to deny Plaintiff the supervisory-development and promotional opportunities that the assignment forecloses, through the filing of this Complaint.

**COUNT VI**
**42 U.S.C. § 1983**
**FOURTEENTH AMENDMENT — EQUAL PROTECTION**
**(Against Defendants Valdez, Liddell, and Brown)**

159. Plaintiff incorporates by reference the preceding paragraphs.

160. The Equal Protection Clause of the Fourteenth Amendment prohibits a state official from intentionally discriminating against a public employee on the basis of race. That right was clearly established at all relevant times.

161. Acting under color of state law, Defendants Valdez, Liddell, and Brown purposefully treated Plaintiff less favorably than similarly situated white nurses with respect to assignment, onboarding and training support, promotion, performance scrutiny, evaluation content, and the response to her complaints of racially hostile conduct.

162. There was no rational or legitimate basis for the differential treatment, and the reasons Defendants gave were unwritten, shifting, contradicted by contemporaneous records, and pretextual.

163. Defendants also subjected Plaintiff, the only African American nurse at WCHD, to a racially hostile work environment and to differential scrutiny, and failed to address race-based conduct that they knew of, in violation of the Equal Protection Clause.

164. As a direct and proximate result, Plaintiff has suffered damages. Plaintiff is entitled to compensatory damages, punitive damages against Defendants Valdez, Liddell, and Brown in their

individual capacities, prospective injunctive and equitable relief against those Defendants in their official capacities, and attorney's fees and costs under 42 U.S.C. § 1988.

**COUNT VII**
**TENNESSEE HUMAN RIGHTS ACT**
**(Against Defendants Valdez, Liddell, and Brown in Their Individual Capacities Only)**

165. Plaintiff incorporates by reference the preceding paragraphs.

166. Plaintiff brings this Count solely against Defendants Valdez, Liddell, and Brown in their individual capacities under Tenn. Code Ann. § 4-21-301(a)(2).

167. Plaintiff does not assert this Count against TDH or against any Defendant in an official capacity. Plaintiff seeks under this Count only damages against the Individual Defendants personally and does not seek declaratory, injunctive, reinstatement, promotion, assignment, record-correction, or other relief under Tennessee law that would operate against TDH, the State of Tennessee, or any state official in an official capacity.

168. TDH, Plaintiff's employer, engaged in unlawful employment practices under the THRA by discriminating against Plaintiff because of race and by retaliating against her for opposing race discrimination, including through the alleged RN4 non-selection, permanent primary WIC assignment under materially disparate conditions, selective WIC scrutiny, and disputed evaluation treatment.

169. Each Individual Defendant had actual knowledge of Plaintiff's complaints and opposition to race discrimination, the alleged unequal treatment she experienced, and TDH's resulting obligation to investigate and correct discriminatory and retaliatory conduct.

170. With that knowledge, each Individual Defendant intentionally aided, abetted, incited, compelled, commanded, and/or substantially encouraged TDH's discriminatory and retaliatory conduct, and prevented or materially impeded a corrective response, including as follows:

171. Defendant Valdez accepted and later postponed or failed to facilitate Plaintiff's request to address race-based mistreatment; issued Nurse A's warning shortly after Plaintiff's complaint; directed the device-surrender and isolation procedures during the January 16, 2025 investigation; instructed Plaintiff and Nurse A not to speak; minimized Plaintiff's objections to investigation-related ridicule; questioned why Plaintiff raised race rather than investigating the merits of her claims; stated that WIC placement had been directed from outside WCHD; and endorsed a race-based rationale for Plaintiff's WIC assignment.

172. Defendant Liddell denied Plaintiff's RN4 application based on an asserted supervisory-experience requirement not stated in the posting; directed or effected Plaintiff's primary WIC assignment at approximately the same time; thereby restricted Plaintiff's access to general-clinic, "left in charge," and supervisory-development opportunities; and participated in maintaining or correcting the evaluation content that was based on allegations supplied by regional management.

173. Defendant Brown created a hostile work environment for Plaintiff, was aware of Plaintiff's November 2024 complaint and subsequent concerns regarding WIC placement and unequal treatment; discouraged or failed to advance Plaintiff's efforts to obtain the general-clinic supervisory experience identified as necessary for RN4 advancement; participated in the events surrounding the January 2025 investigation; and inserted or maintained disputed WIC-training allegations in Plaintiff's annual evaluation despite her prior positive interim evaluation of Plaintiff's clinical performance.

174. The Individual Defendants' conduct did more than constitute supervisory participation in the alleged employment actions. Their acts encouraged, facilitated, ratified, and implemented TDH's allegedly discriminatory and retaliatory treatment and materially impeded TDH's ability or willingness to take corrective action after receiving Plaintiff's complaints.

175. As a direct and proximate result of the Individual Defendants' individual conduct, Plaintiff suffered emotional distress, reputational injury, and other damages recoverable from those Defendants personally under Tennessee law.

176. Plaintiff seeks from Defendants Valdez, Liddell, and Brown, individually and not from TDH or the State of Tennessee, compensatory damages, costs, and any other personal-capacity monetary relief authorized by Tennessee law

**VII. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Enter judgment for Plaintiff;

B. Declare that Defendants violated Plaintiff's rights under Title VII, 42 U.S.C. §§ 1981 and 1983, the Fourteenth Amendment, and Tennessee law;

C. Award back pay, front pay, lost benefits, compensatory damages, and other damages allowed by law;

D. Award damages for emotional distress and reputational injury;

E. Award punitive damages against Defendants Valdez, Liddell, and Brown in their individual capacities under 42 U.S.C. §§ 1981 and 1983 and as otherwise allowed by law;

F. Award pre- and post-judgment interest;

G. Award attorney's fees, expenses, and costs, including under 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k);

H. Award appropriate injunctive and equitable relief, including prospective relief against Defendants Valdez, Liddell, and Brown in their official capacities addressing Plaintiff's promotional opportunity, assignment, evaluation records, and working conditions; and

I. Award all other just and proper relief.

Respectfully submitted,

*/s Seamus T. Kelly*

Seamus T. Kelly (TN BPR No. 032202)
David J. Goldman (TN BPR No. 035151)
MUSIC CITY LAW, PLLC
1033 Demonbreun Street, Suite 300
Nashville, TN 37203
(615) 200-0682
seamus@musiccityfirm.com
david@musiccityfirm.com

*Counsel for Plaintiff*